Good morning, Justice Gould, Justice Fischer, Justice Bay. Thank you for the personalization, but we are judges and we don't want to compete with anybody else. Sometimes people say there's no justice in the Ninth Circuit. I'm not one of them. My name is John Winston. I represent GK Ltd. Travel and Ramsey Signs, who are the two businesses in this case. As you know, this is a case about regulation of on-premise commercial signage by virtue of Lake Oswego's municipal sign code. I would like to reserve half of my time for rebuttal, if necessary. This brief has many issues in it, many cases in it. I can make a brief summary of what our position is. I think we know what the case is about, so if you want to focus on something, I think we may have some questions. I'm open to your questions. I'd like to address your attention to the hospital railroad government categories for exception, and have you addressed why in your view they are unconstitutional? Well, in my view they're unconstitutional because they're content-based. And how so? How does a hospital sign become content-based? Well, the hospital gets an exemption based upon the fact that it is a hospital. As opposed to status exemption. Yes. What are the signs? Emergency entrance? Ambulances only? What are the kinds of hospital signs that you think are being adjudicated for content? Well, I just believe that they're being adjudicated on the basis of, well, I believe that they're content-based because they create an exemption based on the content. It's a hospital sign as opposed to an on-premise sign. It's a hospital sign as opposed to a stop sign. Okay, so a stop sign is content-based? Well, Your Honor, if you regulate pull signs and you create an exemption for the government signs or any other party's signs, when you create the exemptions, the exemption itself makes it content-based. So then whatever the hospital or whatever the government or the railroad, because it's one of those entities, they're allowed to put whatever they want on the sign by virtue of the status? Yes, Your Honor. So that they can put on things, content-type kind of things in their signs that may be aesthetically or otherwise disruptive, whereas a commercial sign can't do it? It appears so, Your Honor. A private person could put a sign up on his building saying hospital one block. I don't believe so under this code, Your Honor. I think there's a restriction. Then it is a status and not a content exemption. Well, Your Honor, my understanding of exemptions, especially from the more recent case, the 9th Circuit case of desert outdoor advertising, I believe that dealt with those as well, is that when you create exemptions, you are creating them based on the content of what's going to be on the sign. Well, then if the content of the sign is hospital one block away and I put it on my building, why isn't the content exempt? I'm having trouble understanding your questions. Well, Judge Fischer was saying that perhaps hospitals, railroads, et cetera, are status exemptions rather than content exemptions. You say no, it's a content exemption. I put you in the case of a private person who is not a hospital owner but doesn't want people driving by his building. So he puts a sign up saying hospital two blocks away. That content is a hospital sign. Is that exempt? Well, Your Honor, again, I believe that this code does not allow the private individual to use that type of sign. I believe there's a prohibition there. And, Your Honor, one of the problems with me addressing these very specific issues on the content basis is we did attack several of these statutes. There obviously could be a different justification for exempting a hospital rather than some similar type of business or some other type of entity. But that's not your burden. No, mine is looking at it facially, Your Honor. That's what I'm trying to understand. So I think we both are. You've also, I think, raised the question about the provision about reading and clarity. Yes, Your Honor. What's your concern about that? Well, Your Honor, it's ambiguous. Readability, we don't know whether it means whether it's conspicuity in terms of being readable from the audience that it was intended to reach, whereas it's conspicuous enough because it's too small, or whether it's readable in the sense that if you get close enough to it, you can tell what it says. And this is a scheme that reduces the size of existing signs, at least as far as my client is concerned, by more than 75%. Most of them are located on busy thoroughfares. So you're talking about a substantial reduction in the ability to communicate with the desired audience. All right. Okay. But, Your Honor, our basic focus is, for the most part, on the debate in this case over, at least the way I see it, is whether metro media and related billboard cases control the city's obligations or whether they do not. If you look at the city's arguments, they're basically structured around billboard cases. And as we've identified in our brief, we vehemently disagree that you can regulate on-premise signs, and these signs contain both commercial and non-commercial speech on the basis of billboard law. In fact, the city of San Diego did not consider traffic safety anesthetics as grounds for regulating their own on-premise signs, even though they decided to regulate the billboard signs. And, Your Honor, one of our other major issues is the burden of proof in this case. The city bears the burden. We believe that it was supposed to come up with specific evidence. We believe Ward is the controlling standard here because the city regulates a mix of commercial and non-commercial speech. And as you can see by the discovery we requested, we tried to obtain all the evidence that the city relied upon when it enacted the code. It came back and said, gee, we lost a bunch of it, so here's what we have, and that's going to have to satisfy what you need. There's something else that's happened during the pendency of this appeal, though, that I should advise the court of. And I really don't know where the court is in terms of this appeal. We tried to get two emergency stays that were denied. But in any event, during this pendency, there have been three cases brought against sign owners in the city of Lake Oswego. I represented the defendants in those cases. Mr. Sirko represented the city in two of the cases. Mr. Bragg, who is in the court with me today, also represented the defendants in the cases. And we were able to explore a little further the city's justification for their regulations. And I don't know whether it would be appropriate to supplement the record, but depending on where the court is, it may be appropriate. One of the things that happened in- The only thing we can conceivably do is take judicial notice of court documents that are uncontested. I mean, there's a judicial opinion out there or something, but we can't transport evidence from another place into our record. And I wasn't clear on that, whether I'd have to do that through a remand and a request through the district court. Well, I think if you're going to ask us to take judicial notice, I think the code requires you give notice to the other side that you're going to do that. Yes, Your Honor, and I'm not asking you to take judicial notice of it. I just had difficulty understanding how to get that information before you because I don't want this appeal to be unduly prolonged. I'm very concerned about the unbridled discretion in this case. And I realize, Justice Fischer, you're also on the on-bank Lombardo panel, and you're probably aware from the last arguments you heard there that there's an unbridled discretion case involving the Oregon Motorist Act that hasn't been resolved for, I think it's going on seven years. We certified questions to the Oregon Supreme Court. Yes, Your Honor. I attended the argument this summer. Okay. Well, you're more up to date than I am. Yes, Your Honor. The unusual feature, though, during that argument was, as you recall, it was trying to put meaning into it for just cause shown, and it involved a theoretical exercise of unbridled discretion in the absence of standards. The violations cases that we took to the Lake Oswego court revolved on that same issue. Okay. Well, we'll hear from counsel for the city. There's some developments that both of you have to be aware of. You can let us know by letter. If you have a dispute about it or you think there's something you want to bring to attention, you can file something post-hearing, and we'll take a look at it. We can't do anything without specifics presented and notice to the other side and the like. The relevance of it, Your Honor, is it goes beyond the theoretical. You can explain it in a supplemental filing after we're done. My view is if both parties are in agreement, they can stipulate to add something to the record for purposes of the case. I don't think if it was a stipulation we would be required to remand to the district court. The parties could also stipulate on a remand to the district court for other factual development that would be helpful. But short of something like that, well, I guess one party could also move for us to remand to the district court for further factual development, and the other party would get notice and an opportunity to respond. But short of that, I don't really want to hear anything about anything outside of the record. I can understand that and appreciate that, Your Honor. I just didn't know how to approach the court to get it into the record, and I feel that it's something that's very important to the courts to know, depending on where the court is going, of course. Our hourly rates are running on this, by the way, on this legal advice that we're giving. I'm sorry, Your Honor. I might be giving bad advice, but you are using your time. Okay. Why don't you reserve your time for the balance and we'll hear from the city. Thank you, Your Honor. Thank you. Good afternoon, Your Honors. My name is Tim Sercom from the firm of Preston, Gates & Ellis, on behalf of the city and the defendants in this case. Addressing Judge Fisher's question first, the district court in this case did adopt a construction of the terms hospital signs or signs for hospital and emergency services, as well as railroad signs, as well as public signs. The construction that he made of that at the request of the city was that those pertain to the owners of the signs, not the content. That's kind of bothersome in light of FODI, because, you know, essentially we're giving that construction says if the government owns the sign, then it can put anything on it that it wants. It's just an ownership status. That seems to be very troublesome. Your Honor, no matter who the owner of the sign is under this code, anyone can put anything they want on signs. This is not a distinction as to whether or not someone can put something or not on a sign. This comes up in the context of exempting certain signs from the requirement of design review, or a permit, if you will. And that's its only relevance. And it comes up in the context of exempting from the requirement for a permit public signs, signs for hospital and emergency services, legal notices, railroad signs, and danger signs. The district court did find that two of those exemptions from the permitting requirement were content-based, that is the legal notices and the danger signs, but adopted limiting construction that had been urged by the city in terms of the remaining terms. That limiting construction does not appeal to this court. Let me just begin by saying I think that there are two key facts in this case that are relevant to all the legal questions that are before the court. And the first is that this code has not been applied to the plaintiffs to prevent their use of the pull sign or to require them to go through any sort of permitting or design review process. That was what the district court found. The pull sign under this record remains standing and continues to display the advertisement for GK's business. So there is no real as-applied issue in this case. The issue in this case involves the facial constitutionality of a number of code provisions, which are generally issues of law, which is why we would object to any sort of addition or supplemental addition to the record here, not involving the summary judgment record before the district court. The second important factual context is that the language of the code does not regulate the message of the signs. It doesn't say you can have this particular content on a sign. You can advertise a commercial product or service. You can talk about an election outcome. It doesn't regulate on that basis. It doesn't have, as is typical for sign codes, any sort of on-premise, off-premise distinction, notwithstanding counsel's recitation of that fact in its opening sentence to this court. It doesn't say you can only talk about things that happen on-site and you can't talk about things. It has none of that. Now, there is an issue between the parties as to whether or not, which the court coincided with Judge Beyer and Judge Fischer's questions pointed out, you know, is it a content-based distinction to distinguish on the basis of the location of the sign or the identity of the owner? And I'll get to that question in just one second. Let me sharpen it a little bit because the hospital one caught my attention. You say it's only design review, but hospitals, I just drove into a hospital not so long ago where they were advertising their on-site pharmacy, which was a proprietary pharmacy. And it occurs to me that under the exemption for hospitals, that a hospital could have a sign that advertised its physician-owned pharmacy on-site, whereas the pharmacy just in the same block or down the street that's competing with it would have to go through the design review. That's correct. Okay, so how does that – and that could happen. How does that fit within the First Amendment framework? I don't think that the First Amendment would look at it in terms of whether or not, you know, that amounts to a content-based distinction. And if not, if it were a reasonable time, place, and manner, it would look to see if the government offered a justification for that distinction that was constitutionally acceptable. But that would be subject to strict scrutiny. Excuse me? That would be subject to strict scrutiny, right? It would not be subject to strict scrutiny if it were not a distinction based on the particular message in the sign. That's the position of the city. The city is that regulation is to talk about the owner of the sign. And let me just jump to that point in the argument, then, because it comes up in a more generic sense in this case, not just with respect to hospitals or whatever. It comes up in the plaintiff's contentions that strict scrutiny applies whenever a city makes a regulatory distinction on the basis of the owner of a sign or activities that are being done in connection with the sign. The city here makes distinctions, as do most cities, in terms of whether or not the amount of allowed signage, in terms of number of signs or square footage of the signs, depending upon whether or not the sign is located in a residential district, commercial district, or industrial district, essentially distinguishing in the permanent signage what the use of the land is and then allowing or not allowing a specific amount of signage based on those land uses. And it sometimes drills down in the sign code to say that if you're a hotel, you can have a greater square footage, or if you're a movie theater, you can have a supplemental amount of signage, again, based on the use of the property. And in the temporary sign allowances, those same distinctions are made as well, that you can have temporary signs, again, and you can say anything on these signs. It's not a content-based or subject matter distinction. It is that if these activities are occurring or using the land in this fashion, you can have temporary additional signage. And does that mean, then, during an election, where you have the window of exemption, that temporary window, that anybody, all bets are off for anybody, regardless of whether the sign relates to the election or not? That is correct. In fact, that is what the sign code explicitly says. So, for example, GK could put up, during an election period, GK could put up a temporary sign that's larger, different, bigger. It doesn't have to meet the design requirements during that interval of time. That is correct. So, the issue is, you know, again, according to… What's the rationale for that? To get around content-based? Exactly. It is to get around content-based distinction. But, as a policy matter, the rationale is to allow for additional signage opportunities when there is more of a need to talk. You know, I mean, if the city could… It is just a little curious. I don't want to belabor it, but there are a lot of business… I can only speak from my experience in Los Angeles, of course, that these fluorescent big signs that will be put up and carried on poles or will be stuck on poles to advertise, for example, apartment vacancies or what, that you're trying to attract people's attention on weekends. And you're suggesting that, during an election, whatever the restrictions may be on those kinds of signs are all taken off the board during an election time period. No, it is not the case that all restrictions are taken off during election time. There is an allowance for temporary signs during elections, and that allowance defines the allowed area and some other technical specifications for those temporary signs. As long as you're within that, you could be advertising or going out of business sale for an Oriental rug. Right, or you could say… Or always going out of business. Right, or you could say visit GK Travel. Okay. The legal issue under the Ward case, then, is whether or not these kinds of allowances, depending upon the land use or depending upon the activities on the property, represents a potential censorship or are done because of, quote, a disagreement with the message that the sign conveys, close quote. And that becomes the test, then, in terms of the court looking at it to see whether or not these greater allowances of speech are content-based discriminations. And so what the Supreme Court has said, you know, about can you regulate without having to go through compelling interest justification based on the location of the sign, based on things that are happening around the sign itself, that was addressed in the Hill v. Colorado case, which was the eight-foot distance from people entering and leaving medical clinics and hospitals case. And the court found that the law was not a regulation of speech, but, quote, a regulation of the places where some speech may occur, close quote. And so it is very basic, I think, that the government can regulate time, place, place and matter, place where speech occurs. And it can, you know, say in certain places you cannot speak and can justify that on a content-neutral basis or then it's subject to less of a justification than if it were content-based. Similarly, here it can allow speech, depending upon locational characteristics, without having to show a compelling interest. Any different rule would essentially set up all sign codes of any legitimacy because that's the way all sign codes work, to classify signage on the basis of what's happening in terms of land uses around the sign. Finally, I should note that Hill v. Colorado also rejects one of the assertions that plaintiffs make here that any time you have to look at a sign in order to evaluate whether or not a regulation applies, that it is a content-based regulation. Hill, the Hill court, expressly rejects this in saying, quote, that the court has never held or suggested that it is improper to look at the content of an oral or written statement in order to determine whether a rule of law applies to a course of conduct, close quote, and allowed for, in the words of the court, a cursory examination in order to determine whether or not the regulation applies. How does that work out in the readability clarity? How does that get to the content as to whether it's readable, clear? I mean, what do those terms mean? The district court gave a construction of the readability and clarity term also that was not appealed in terms of a limiting and constitutional construction to mean its legibility, whether or not it could be viewed or discerned by a viewer and not having to do with whether or not it makes linguistic or content sense. What about clarity? Both of those terms were construed to mean how the sign appears in terms of whether or not you can read the message. And those were not appealed? That was not appealed. Could you address the point that counsel raised? Assuming without resolving the burden at this point, what is the showing, if the city were put to a showing of the substantial government interest and the narrow tailoring, what is in the record to show why these various restrictions were adopted and justified? I'd be glad to address that, Your Honor. I want to note first that we are talking about the Ward versus Rock against Racism test, and that is that we're looking at content-neutral regulations. We're not looking at... Do that and then assume you slip off the map and wind up on strict scrutiny. Do you think there's enough in the record to satisfy the stricter scrutiny? You have to come within Ward, don't you, on the record that exists now? Essentially, we've made some arguments in the summary judgments that there are some compelling interests with respect to some of the regulations of signs but not others. And I think that from the city's position, again, we are applying the Ward formula. We're not applying the central Hudson, which has to do with when a regulation regulates and talks about allowing commercial speech or not allowing commercial speech, depending upon the circumstances, the central Hudson test applies. We don't have any regulation of commercial speech here. It is a Ward case. And looking at the Ward factors, I think that the record is that the policies of the city about the purposes, about why it's regulating, its aesthetic interest, if you will, were originally derived in the city's land use comprehensive plan, which was adopted prior to the sign code here in 1994. And the comprehensive plan, which under state law has its own participatory and very complicated adoption process, came out with particular policies about what the community wanted these two business districts to look like. It talked about a village atmosphere in the two business districts where the sign code provisions that we're talking about apply. It talked about having design review generally throughout the city in order to meet certain policies within that plan. Second, the record has, in addition to the concise statement of material facts, which have some admissions on both sides of this question, the record consists of affidavit of the city manager that authenticates a 10-year process, if you will, that the city went through in terms of looking at, in particular, the regulation of poll signs in the context of the sign code and the use of design review to allow or disallow signs. It goes through a number of meetings and hearings that were held in 1993 and 1994. The code was then separately reconsidered, particularly these provisions in 1999, again in 2000, and again in 2003. There were 27 meetings, hearings, and workshops that were held before city decision makers and community groups about these sign code provisions over that period, many of which involved public hearings. It shows, again, specific concerns about sign clutter, about the effectiveness of sign communication, about community aesthetics, and about the need to regulate on the basis of those concerns, particularly in the area of poll signs and design review. The record also shows, and the manager said in his affidavit, and there's nothing to contradict this, that the city has not used its sign code to censor messages. It hasn't applied its sign code to say, no, we don't like this particular sign message, so come back with a talking about something else. The plaintiffs in the record had discovery access and did look at 10 years of sign permits, 10 years of sign enforcement files, every record that the city had over a 10-year period for signs, and didn't come up with any sort of censorship use of the sign code to censor. Again, treating the ward factors, the purposes are those that are stated in the code, that are explicitly stated. This code has expressed statements of purpose in the code itself, which have been found to satisfy the ward purpose requirements in other cases. The fact, plaintiffs value that there's some testimony that people say, well, these purposes aren't applied in individual sign permitting decisions, and that's true. They are applied in some other contexts, but they're not applied in deciding whether or not to grant a sign permit or not in the first instance. But that doesn't undercut the fact that they are the purposes of the legislators and the legislature here, the city council, in adopting this sign code. They talk about the traditional purposes of setting traffic safety and sign effectiveness, sign clutter as being the reasons why the city was regulated. Those are, although plaintiffs dispute it, those are substantial governmental interests. They've been found to be substantial governmental interests by courts, by the Supreme Court, not just in billboard cases, as plaintiffs assert, but in picketing cases, in the Vody case by this court, in free expression zone cases, in the Cubo case. And the Supreme Court, in the taxpayers for Vincent, and the city of Ladue case has sustained those purposes as substantial. In fact, the court in Ladue says that it's common ground that governments may regulate the physical characteristics of signs. The big difference between the parties here lies in the part of the ward test about whether or not, what is the degree of proof necessary to show that those governmental purposes are achieved or advanced narrowly by the regulations in question. And what they say is that this proof is something of expert opinion, a matter of bringing in witnesses at a trial whenever the city applies the sign code or whenever it's challenged. And it is the city's burden to show by evidentiary proof what the community aesthetics are and that having a design review process advances that community aesthetic interest. What we suggest here is that that means-ends analysis in the ward situation, that when you're applying it to a content-neutral time, place, and manner restriction, that the courts give deference to that legislative choice of means and end. It is only when you deal with a commercial speech and regulating on the basis of allowing or disallowing commercial speech that less deference is given. That's the cases that they rely upon, Fane, Turner versus the United States, and lower law of tobacco. Finally, there are alternatives to poll signs, if that's the regulation that we're focusing on. What this poll sign does is basic regulations essentially require signs to be lowered. It allows the same signage to be grounded or put on the wall. Finally, I do want to touch on one in my final 30 seconds on call the court's attention to the issue of unvital discretion. We differ, the parties differ, in terms of whether or not, with respect to unvital discretion, they interpret that requirement to mean any discretion in a permitting thing, makes the regulation constitutionally improper. I think that this court, and putting it to Judge Goldberg, Menotti versus the City of Seattle, rejected that. Any discretion standard for, in actually footnote 62 of the case, the issue is whether or not there are standards in the regulation to guide the discretion and to allow for meaningful judicial review. We think there are in this case, and we rely on our brief for that argument. Thank you very much. Thank you. Counsel? First of all, I'd just like to readdress the readability clarity issue. As the court may recall, part of the record is the deposition of City Manager Doug Schmitz. I believe that he admitted that that could be interpreted in various different ways, depending on which city employee was interpreting it. Counsel says that the district court adopted a narrowing construction. Does Mr. Schmitz's response depend on that narrowed construction or the un-narrowed construction? I don't think it contemplated the court's narrowing construction, Your Honor. And as a matter of fact, what Mr. Schmitz said about that is compatible with what he said about the application of the design review clause, which has the same problem. It can be applied various ways by various individuals that work for the city, depending on what their particular view of how the sign looks or should look is. Is it your position that the narrowing constructions don't address that problem? Yes, Your Honor. Because? Well, Your Honor, no matter how you try to regulate it in advance, if you subject the ultimate permission to speak to Mr. Serkin tried to say that the city has standards. It does have standards, Your Honor, but it doesn't honor the standards. It modifies the standards. Is that a facial claim or an as-applied claim? It's an as-applied claim. Is there an as-applied claim here? And a facial claim. Well, I'd have to go. Your Honor, we have facial and as-applied claims throughout the complaint. Unfortunately, it's so complex I can't. I've been focusing my effort on the case law and other attributes, so I'm not able to answer some of these questions that are that specific. But there are some other things I would like to point out in terms of what Mr. Serkin said. First of all, the G.K. Travels sign is not where it used to be, and it's not what it used to be. G.K. Travels is out of business. The successor now has a monument sign. G.K. Travel was threatened, as other individuals in the city were, with $1,000-a-day fines if it didn't take the sign down. So that's simply not true. And, Your Honor, Mr. Serkin also alludes to a comprehensive land-use plan as the justification for the regulatory scheme, but that's a land-use plan. There's no evidence that they... If the land-use plan allows the city to regulate speech, then the city has to pass the speech test. It can't simply discard it. And it passes the speech test by coming with evidence that it considered the harm that justified the substantial government interest, that it implemented a statute that furthered that interest, and that it did so in a manner that reasonably accommodated the speaker's needs. There's no evidence at all on that fourth element. There's no evidence on furthering. There's no evidence on harm. As far as the... Are you applying Ward or are you applying a different... I'm applying Ward, Your Honor. And we tried to discover the evidence. It simply wasn't there. I think that that causes them to fail. And I'd like to mention something else about Ward and Central Hudson. Central Hudson is more lenient toward the city, not more strict. Central Hudson would allow the city to regulate on the basis of content if it was pure commercial speech. And as far as the standards, I wanted to make this point. There are standards that specify how large the signs can be, et cetera, what kind of copy they're supposed to have on them, but the city allows planners and other officials to trump those standards when someone comes and applies for a permit. It allows the permitting official to reduce the size of the sign, change the graphics on it, do whatever he wants to. We have evidence of that. Of course, it's not in this case yet. It was developed... It's not one case. I'm sorry, Your Honor. It's the evidence that was developed after the appeal was filed and violations proceedings were commenced. And, Your Honor, I think the city has a very huge problem with Edenfield v. Fane, which I still believe the law applies even though this is a mixed scheme because I don't see how any judge could possibly go through the record the city supplied and identify the precise interests that the city's forwarding and make sure that those are the precise interests that the city's forwarding. That's part of the problem with the conflicting evidence argument we raised where supposedly the sign code is based on these purposes, but these purposes were carried over from a prior sign code, essentially without any modification, essentially without any reasoning process, any deliberative process to establish that those were the right purposes that justify grade-valuing the signs that are being regulated. Pull signs weren't going to be banned and abolished before 1993, yet those same clauses are in the pre-93, the same purposes are in the pre-93 statutes or ordinances, Your Honor. And also in taxpayers for Vinson. Some of this I'm recalling from your briefs. Okay. You don't have to bear the burden of carrying your whole case, summarizing it. You've got new things that aren't in your brief. Okay. The only new thing is your briefs, and we'll read them again. Okay. The new things that I have that aren't in the brief came out of the violation proceedings. Well, they can't. I don't mean that. I can't argue those. So essentially I don't have anything more that was in the brief. That's fine. Okay. Thank you very much. Thank you. Counsel, we appreciate the argument, so that's another interesting case, and we will consider it submitted.
judges: Fisher, Gould, Bea